**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

DENNIS ANDREASSEN,

        Plaintiff,

vs.

HY-VEE, INC.,

        Defendant.

No. 15-CV-2003-LRR

**ORDER**

---

*TABLE OF CONTENTS*

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    **RELEVANT PROCEDURAL HISTORY** . . . . . . . . . . . . . . . . . . . . . **2**

III.   **SUBJECT MATTER JURISDICTION** . . . . . . . . . . . . . . . . . . . . . **2**

IV.   **SUMMARY JUDGMENT STANDARD** . . . . . . . . . . . . . . . . . . . . . **3**

V.    **RELEVANT FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . **4**

      A.    *The Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
      B.    *Andreassen's Diabetes* . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
      C.    *Employment With Hy-Vee* . . . . . . . . . . . . . . . . . . . . . . . . . **5**
      D.    *Transfer & Termination* . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

VI.   **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

      A.    *Qualified Individual* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
      B.    *Failure to Accommodate* . . . . . . . . . . . . . . . . . . . . . . . . . **16**
           1.    *Shift rotation as an essential function* . . . . . . . . . . . . . . . **18**
           2.    *Good faith and reasonable accommodation* . . . . . . . . . . . . **21**
      C.    *Discrimination* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**
           1.    *Adverse employment action* . . . . . . . . . . . . . . . . . . . . . **25**
           2.    *Motivation and pretext* . . . . . . . . . . . . . . . . . . . . . . . . **28**
                a.    *The transfer* . . . . . . . . . . . . . . . . . . . . . . . . . . **30**
                b.    *The termination* . . . . . . . . . . . . . . . . . . . . . . . **31**

*VII.  CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *35*

## I.  INTRODUCTION

The matter before the court is Defendant Hy-Vee, Inc.'s ("Hy-Vee") "Motion for Summary Judgment" ("Motion") (docket no. 9).

## II.  RELEVANT PROCEDURAL HISTORY

On December 29, 2014, the Plaintiff Dennis Andreassen filed a "Petition at Law and Demand for Jury Trial" ("Petition") (docket no. 4) with the Iowa District Court for Black Hawk County.  In the Petition, Andreassen states that Hy-Vee harassed and discriminated against him based on his Type II diabetes in violation of the "Americans With Disabilities Act of 1990" ("ADA"), 42 U.S.C. § 12112(a), and the "Iowa Civil Rights Act of 1965" ("ICRA"), Iowa Code § 216.6.  He also states that Hy-Vee retaliated against him for attempting to obtain reasonable accommodations for his disability.  He seeks compensatory damages, punitive damages and attorneys' fees.  On January 26, 2015, Hy-Vee removed the case from the Iowa District Court for Black Hawk County and brought the matter before the court.  *See* Notice of Removal (docket no. 2).  On February 3, 2015, Hy-Vee filed an "Answer and Jury Demand" ("Answer") (docket no. 5), generally denying liability.

On February 1, 2016, Hy-Vee filed the Motion.  On February 25, 2016, Andreassen filed a Resistance (docket no. 10).  On March 7, 2016, Hy-Vee filed a Reply (docket no. 11).  No party requests oral argument.  The Motion is fully submitted and ready for decision.

## III.  SUBJECT MATTER JURISDICTION

The court has original jurisdiction over the ADA claim because it arises under the United States Code.  *See* 28 U.S.C. § 1331 ("The district courts shall have original

jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

The court has supplemental jurisdiction over the claim arising under the ICRA because it is so related to the claim within the court's original jurisdiction that it forms part of the same case or controversy. *See* 28 U.S.C. § 1367(a) ("[T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ."). In other words, "the federal-law claim[] and state-law claim[] in the case 'derive from a common nucleus of operative fact' and are 'such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding.'" *Kan. Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc.*, 77 F.3d 1063, 1067 (8th Cir. 1996) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988)) (third alteration in original) (quotation marks omitted).

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show'" an absence of a genuine dispute as to a material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Fed. R. Civ. P. 56(c)(2)). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)). "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson*, 643

F.3d at 1042 (alterations in original) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Once the movant has done so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'"  *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324).

On a motion for summary judgment, the court must view the facts "in the light most favorable to the nonmoving party."  *Id.* (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment is appropriate.  *Ricci*, 557 U.S. at 586 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  "The nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts . . . .'"  *Torgerson*, 643 F.3d at 1042 (quoting *Matsushita*, 475 U.S. at 586).  Instead, "[t]o survive a motion for summary judgment, the nonmoving party must substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy."  *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011) (second and third alterations in original) (internal quotation marks omitted) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34 (8th Cir. 2003)).  Mere "self-serving allegations and denials are insufficient to create a genuine issue of material fact."  *Anuforo v. Comm'r*, 614 F.3d 799, 807 (8th Cir. 2010).

### V.  RELEVANT FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to the nonmoving party and affording him all reasonable inferences, the uncontested material facts are as follows.

### A.  The Parties

Andreassen is an individual residing in Evansdale, Iowa who was employed by Hy-Vee until his termination on July 4, 2014.  Defendant Statement of Facts (docket no. 9-1) ¶ 1; Plaintiff Statement of Additional Facts (docket no. 10-2) ¶ 2.  Hy-Vee is a corporation

organized and existing under the laws of the State of Iowa. Defendant Statement of Facts ¶ 2. Hy-Vee owns and operates a grocery store located in Waterloo, Iowa. *Id.*

### B. Andreassen's Diabetes

On January 30, 2014, Andreassen was diagnosed with Type II diabetes. *Id.* ¶ 7. Andreassen manages his diabetes through diet and oral medication. *Id.* ¶ 8. This requires him to occasionally check his blood sugar, take oral medications and eat small meals or snacks during working hours. *Id.* ¶ 9. To do so, Andreassen must take several short breaks throughout the day. *Id.* ¶ 21. During the relevant time period, when Andreassen needed to take such a break, the time was not deducted from his allocated paid break time, but rather was viewed as a "bathroom break." *Id.* ¶ 22. During his time at Hy-Vee, Andreassen was never explicitly denied any request to take medical leave to manage his diabetes or denied time to take a bathroom break to monitor his blood sugar, take his medication or eat a small meal. *Id.* ¶ 23.

### C. Employment With Hy-Vee

Andreassen began working for Hy-Vee in August 1993 as a part-time courtesy clerk. *Id.* ¶ 4. In June or July 1994, Hy-Vee hired Andreassen as a full-time third-shift stocker, working the overnight shift. *Id.* ¶ 5; Plaintiff Statement of Additional Facts ¶ 1. In 2008, Andreassen was transferred to Hy-Vee's gas station. Defendant Statement of Facts ¶ 6; Plaintiff Statement of Additional Facts ¶ 1. While working at the gas station, Andreassen's hours would vary from week to week. Defendant Statement of Facts ¶ 6; Defendant Appendix (docket no. 9-3) at 12. Sometimes he would work the night shift, other times he would work the day shift and would sometimes work both in the same week.

On January 29, 2014, Andreassen was given a one-week suspension without pay from the gas station for repeated instances of leaving the gas station door unlocked overnight. Defendant Statement of Facts ¶ 26. Prior to January 2014, Andreassen had

been written up for failing to lock the gas station doors correctly. *Id.* ¶ 29. In early 2014, Libby Webber, Andreassen's supervisor at the gas station, also wrote Andreassen up four times for failure to properly count the money in the gas station cash registers. *Id.* ¶ 28; Plaintiff Statement of Additional Facts ¶¶ 10-14. These write-ups resulted from an informal policy that Webber had implemented. Plaintiff Statement of Additional Facts ¶ 9. While Webber had been keeping track of miscounted registers as early as February 2013, she did not begin issuing written warnings until February 2014. *Id.* As part of the policy, "if an employee received [three] written warnings in [six] months, then it would result in [a one] week suspension for that employee." *Id.* During this time, another gas station employee received a write-up for miscounting the register. *Id.* ¶ 16. After being told by the other employee that she was instructed to ignore the write-up, Andreassen consulted with Rob Green, the Assistant Store Manager, regarding whether he could be suspended for miscounting the register. *Id.* ¶¶ 16-17. Green told Andreassen that he could not be suspended for such a write-up and that he would discuss the same with Webber. *Id.* ¶ 17. On April 29, 2014, Webber suspended Andreassen for repeated failures to properly count the registers. *Id.* ¶ 18. Andreassen approached Green regarding his suspension, and Green overruled the suspension. *Id.* ¶ 19. At that time, Andreassen expressed concern about continuing to work with Webber. *Id.*

During the period following his diagnosis, "Andreassen requested that . . . Web[b]er modify his work schedule, so that he could make the necessary adjustments in his daily life to allow the [diabetes] medication to work in his favor." *Id.* ¶ 7. In particular, he asked to be moved to straight day shifts, instead of the rotating shift schedule that he had been working at the gas station, when there would be more employees around and it would be easier to take a break. *Id.*; *see also* Defendant Appendix at 26 (deposition testimony from Andreassen stating that he requested "a more consistent schedule" and stating that "[i]t was the fluctuation in the schedule" that was a problem). Webber refused

and continued to schedule him on a rotating shift basis. Plaintiff Statement of Additional Facts ¶ 7. Webber stated that it was "not possible" to schedule him for straight day shifts and that she knew of several diabetic employees that did not need any special accommodations to manage the disease. *Id.* ¶ 8. Andreassen suggested that another gas station employee, "who would commonly work day shifts," could be scheduled to work any nights that Andreassen would otherwise be expected to work. *Id.* Webber refused to rearrange the schedule. *Id.*

### D.  Transfer & Termination

On April 30, 2014, following his request for a schedule modification and the incident involving his overturned suspension for failing to count cash registers, Andreassen was called to the main store to speak with Ashley Lewis, the Human Resources Manager. *Id.* ¶ 20.  Lewis informed Andreassen that he could be moved from the gas station, and that the only other available full-time positions were as a third-shift night stocker or in the bakery. *Id.*; Defendant Statement of Facts ¶ 11. Andreassen did not wish to take the night stocker position, as he had experience in that position and was uninterested in going back to it.  Plaintiff Statement of Additional Facts ¶ 20.  On May 2, 2014, Lewis called Andreassen to the main store and informed him that he would be moved to the bakery and that, "if he did not take this position, then there was no other opportunity for Andreassen at Hy-Vee." *Id.* ¶ 22.  At the bakery, Andreassen would work from 12:00 p.m. to 8:00 p.m. five days a week. *Id.* ¶ 23.  At the bakery, Andreassen remained a full-time employee with the same salary and benefits he had at the gas station.  Defendant Statement of Facts ¶ 16.

On May 6, 2014, Andreassen reported to work for his first shift with the bakery and was escorted there by Lewis.  Plaintiff Statement of Additional Facts ¶ 24.  Again, she indicated that "this was [Andreassen's] last chance, and if Andreassen was not able to handle it in the bakery, then there would be no job for him at Hy[-]Vee." *Id.*  At the

bakery, day shift employees would normally go home sometime between 3:00 p.m. and 4:00 p.m. *Id.* ¶ 26. This meant that Andreassen would spend the latter half of his shift in the bakery by himself and close the department by himself at the end of his shift. *Id.* Andreassen's supervisor in the bakery was Cory Weber, who would leave around 1:00 p.m. or 2:00 p.m. every day. *Id.* ¶ 27. It appears that Weber is also diabetic. *See* Defendant Statement of Facts ¶ 15; Defendant Appendix at 21 (deposition testimony from Andreassen confirming that Weber is diabetic).

Andreassen received on-site training for the bakery and generally feels that his coworkers did a good job training him. *See* Defendant Statement of Facts ¶ 19. As part of his training, Andreassen was instructed by a co-worker that, if he did not know how to label or package a specific product, he should cover the item, leave it in storage and it would be completed the next morning by the day staff. Plaintiff Statement of Additional Facts ¶ 36. Despite his on-site training, there were still many products that Andreassen did not know how to label. *Id.* ¶ 37. He was also never trained on how to calculate the expiration dates for the different items. *Id.*

On June 26, 2014, Green, Lewis and Weber called Andreassen in for a meeting. *Id.* ¶ 28. The purpose of the meeting was to discuss three write-ups that had occurred on June 19, 21 and 22, 2014. *Id.* At the meeting, Andreassen received a written warning and was told that he would "only be given one chance." *Id.* ¶¶ 28-29. Andreassen reiterated that he needed to take regular breaks, to which Green responded, "I hope you are not using your [d]iabetes as a crutch, because it will eventually come out from under you, and you are going to fall flat on your face." *Id.* ¶ 31. Following this meeting, Andreassen's wife looked on the Hy-Vee employee's website and found online training courses for bakery employees. *Id.* ¶ 38. However, no one had notified him that he should review those training courses when he was transferred to the bakery. *Id.* On July 4, 2014, Andreassen was called in for a meeting with Green and Weber. He received another

written warning for mislabeling muffins and lunch box cookies. *Id.* ¶ 34. Andreassen was terminated at that time. *Id.*

Hy-Vee has a written employee handbook, which it issues to its employees. Defendant Statement of Facts ¶ 24. The handbook contains an anti-discrimination policy that "protect[s] qualified individuals with disabilities from discriminatory treatment and harassment because of their disability." *Id.*; *see also* Defendant Appendix at 33. The handbook further provides a complaint procedure for employees who feel they have been subjected to discrimination or harassment based on some protected status. Defendant Statement of Facts ¶ 24; Defendant Appendix at 34. Andreassen never lodged a discrimination complaint with anyone at Hy-Vee during his employment or following his termination. Defendant Statement of Facts ¶ 25. Following his termination, Andreassen lodged a complaint with the Iowa Civil Rights Commission. Petition ¶ 19. The Iowa Civil Right Commission issued him a right to sue letter. *Id.*; *see also* Defendant Appendix at 6. Therefore, Andreassen has exhausted his administrative remedies.

## *VI. ANALYSIS*

The ADA[1] makes it unlawful for a covered entity to "discriminate against a qualified individual on the basis of disability in regard to . . . [the] discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination in this context includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . . ." 42 U.S.C. § 12112(b)(5)(A). The ICRA makes it unlawful for any person to "discharge any employee, or to otherwise discriminate in

---

[1] In 2008, Congress amended portions of the ADA, in part, to clarify what conditions constitute a "disability" under the statute. The amended law is known as the "Americans With Disabilities Act Amendments Act of 2008" ("ADAAA"). For the purposes of this Order, the court shall use the term ADA to mean both the ADA and ADAAA.

employment against . . . any employee because of the . . . disability of such . . . employee." Iowa Code § 216.6(1)(a). As a general matter, claims of disability discrimination are analyzed identically under the ADA and the ICRA. *See Kallail v. Alliant Energy Corp. Servs., Inc.*, 691 F.3d 925, 930 (8th Cir. 2012). Andreassen does not argue for a departure from this well-established rule.

Here, because Andreassen alleges that Hy-Vee discriminated against him due to his diabetes and that it failed to accommodate him, he "must establish both a prima facie case of discrimination based on disability and a failure to accommodate it." *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 905 (8th Cir. 2015). To establish a prima facie case of discrimination, Andreassen must prove: "(1) [he] is disabled within the meaning of the ADA; (2) [he] is a qualified individual under the ADA; and (3) [he] has suffered an adverse employment decision because of the disability." *Id.* (quoting *Kallail*, 691 F.3d at 930). A plaintiff can demonstrate discrimination with direct evidence or by raising the inference of discrimination through the *McDonnell Douglas* burden-shifting framework. *See St. Martin v. City of St. Paul*, 680 F.3d 1027, 1033 (8th Cir. 2012). The *McDonnell Douglas* framework requires the plaintiff to allege facts supporting a prima facie case of discrimination. *Id.* If the plaintiff does so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. *Id.* If the employer does so, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason is mere pretext. *Id.*

However, when the plaintiff alleges that the employer failed to make a reasonable accommodation, the court applies a modified burden-shifting analysis. *See Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003). Under the reasonable accommodation framework, the employee must initially demonstrate that: (1) he has a disability as defined by the ADA; (2) he has suffered an adverse employment action; and (3) he is a qualified individual. *Id.* If the employer disputes that the employee can

perform the essential function of his job, the burden shifts to the employer to demonstrate what the essential functions of a job are. *Id.* If the employee cannot perform the essential functions of the job without an accommodation, the plaintiff need only demonstrate that a reasonable accommodation is possible. *Id.* "The burden of production [then] shifts to the employer to show that it is unable to accommodate the employee." *Id.* (alteration in original) (quoting *Benson v. N.W. Airlines, Inc.*, 62 F.3d 1108, 1112 (8th Cir. 1995)). "If the employer can show that the employee cannot perform the essential functions of the job even with reasonable accommodation, then the employee must rebut that showing with evidence of his individual capabilities." *Id.* (quoting *Benson*, 62 F.3d at 1113). "At that point, the employee's burden merges with his ultimate burden of persuading the trier of fact that he has suffered unlawful discrimination." *Id.* (quoting *Benson*, 62 F.3d at 1113).

"To be considered disabled within the meaning of the ADA, [Andreassen] must show 'a physical or mental impairment that substantially limits one or more major life activities.'" *Schaffhauser*, 794 F.3d at 905 (quoting 42 U.S.C. § 12102(1)). For the purposes of the Motion, Hy-Vee concedes that Andreassen's diabetes qualifies as a disability under the ADA. *See* Brief in Support of the Motion (docket no. 9-2) at 3. Therefore, the court shall first address whether Andreassen is a "qualified individual" under the meaning of the ADA, and it will then proceed to analyze whether summary judgment is appropriate in favor of Hy-Vee on either Andreassen's failure to accommodate claim or his discrimination claim.

### A. *Qualified Individual*

A threshold question in the instant action is whether Andreassen is a "qualified individual" under the terms of the ADA. Both Andreassen's failure to accommodate claim and his discrimination claim require him to establish that he is a qualified individual under the ADA as part of his prima facie case. *See Schaffhauser*, 794 F.3d at 905; *Fenney*, 327 F.3d at 712. Hy-Vee argues that Andreassen is not a "qualified individual" because he

was too ill to work following his termination from Hy-Vee. Brief in Support of the Motion at 4. Hy-Vee argues that the fact that Andreassen was unable to get another job until more than a year after his termination demonstrates that he was unable to perform the essential functions of his job, even with an accommodation. *See id.* Andreassen argues that he is a qualified individual because his diabetes did not become severe enough to prevent him from working until early 2015, five months after he was terminated. Brief in Support of the Resistance (docket no. 10-1) at 8-9.

"In order to be a qualified individual for the purposes of the [ADA], the plaintiff must '(1) possess the requisite skill, education, experience, and training for [the] position, and (2) be able to perform the essential job functions, with or without reasonable accommodation.'" *Minnihan v. Mediacom Commc'ns Corp.*, 779 F.3d 803, 810 (8th Cir. 2015) (second alteration in original) (quoting *Fenney*, 327 F.3d at 712). Hy-Vee does not dispute that Andreassen possessed the requisite skill, education, experience and training for the position. Therefore, the court shall only consider whether Andreassen could perform the essential functions of the bakery position, with or without a reasonable accommodation. The Eighth Circuit Court of Appeals has stated that "regular attendance at work is an essential function of employment." *Brannon v. Luco Mop Co.*, 521 F.3d 843, 849 (8th Cir. 2008). Therefore, if an employer can provide a reasonable accommodation to allow the employee to regularly attend work, such an employee remains a qualified individual.

"While allowing a medical leave of absence might, in some circumstances, be a reasonable accommodation, '[a]n employer is not required by the ADA . . . to provide an unlimited absentee policy.'" *Id.* (alteration in original) (quoting *Buckles v. First Data Res., Inc.*, 176 F.3d 1098, 1101 (8th Cir. 1999)) (citation omitted). Thus, an employer's refusal to allow for reasonable medical leaves of absence may constitute a failure to accommodate rather than make the employee unqualified. *See, e.g.*, *Graves v. Finch*

*Pruyn & Co., Inc.*, 457 F.3d 181, 186 n.6 (2d Cir. 2006) (collecting cases and suggesting that a "finite" leave of absence, at the conclusion of which the employee will make a "successful return," may be a reasonable accommodation). However, an employer is not bound to retain an employee who is too ill to perform the duties of his or her job with no idea of when they will be well enough to return to work. *See Peyton v. Fred's Stores of Ark., Inc.*, 561 F.3d 900, 903 (8th Cir. 2009) (noting that an employer "should not be burdened with guess-work regarding an employee's return to work after an illness" and that employers need not grant "a request for an indefinite leave of absence"). Accordingly, the question of whether Andreassen was a qualified individual turns on whether he was too ill to work following his termination from Hy-Vee and, therefore, no reasonable accommodation was available to allow him to regularly attend work.

In his deposition, Andreassen testified that he was "out of work" from July 4, 2014 to September 2015. *See* Defendant Appendix at 9. He stated that he did not find another job following his termination from Hy-Vee because his "diabetes was so severe . . . [he] didn't feel there was [any] way that [he] could work any kind of a position until" he found a new job in September 2015. *Id.* He also stated that his parents were not in good health and that he needed to be available to care for them. *Id.* He testified further as follows:

> Q.　　Okay.　So if you had still been employed at Hy-Vee, you would have been unable to work.
>
> A.　　Right.
>
> Q.　　Are you currently able to work?
>
> A.　　Yes.
>
> Q.　　Let me go back one step.　Did you even look for a job between July 4th, 2014, and September of 2015?
>
> A.　　Yes.
>
> Q.　　Okay.　And where did you look for a job?

A.    Through the Internet. Through job search sites that I had — the apps that I had on my phone that I used and through my wife's laptop or —

Q.    But even if you'd found a job, you wouldn't have been able to take it because of your health —

A.    Right.

Q.    — and because of your family commitments.

A.    Right.

*Id.* In his affidavit, Andreassen simply states: "In early 2015, my [d]iabetes got much worse, and I became so ill that I was unable to work. This continued until the late summer, when I began to look for employment again. I found another job on September 2, 2015." Plaintiff Appendix (docket no. 10-3) at 11. Andreassen's wife states: "Early in 2015, [Andreassen] had a severe worsening of his diabetes and health, and he was not in a condition to be employed full time." *Id.* at 13.

Hy-Vee argues that Andreassen's statement in his affidavit that he did not actually become too ill to work until early 2015 directly contradicts the testimony he gave in his deposition. Reply at 4. Hy-Vee argues that, "[t]o the extent that the affidavits of [Andreassen] and his wife contradict his deposition testimony, they should be disregarded." *Id.* Hy-Vee argues that Andreassen cannot use a self-serving affidavit to generate an issue of material fact in response to the Motion. *Id.* Andreassen argues that Hy-Vee has taken his deposition testimony "out of context" and that, when he testified he was too ill to work following his termination from Hy-Vee, "he was referring to the end of that long period of unemployment, not to the time period immediately following his termination from Hy-Vee." Brief in Support of the Resistance at 8.

The court may strike or disregard portions of an affidavit if it directly contradicts testimony that the affiant has previously given in a deposition. *See Progressive N. Ins. Co. v. McDonough*, 608 F.3d 388, 391 (8th Cir. 2010); *City of St. Joseph, Mo. v. S.W. Bell*

*Tel.*, 439 F.3d 468, 475-76 (8th Cir. 2006). A party may not simply fabricate issues of material fact at the eleventh hour by filing a self-serving affidavit directly contradicting previous deposition testimony. "[I]f 'testimony under oath . . . can be abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary judgment.'" *City of St. Joseph*, 439 F.3d at 476 (quoting *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365 (8th Cir. 1983)). The Eighth Circuit has stated that courts should use "extreme care" in determining whether to disregard an affidavit and should "only grant summary judgment where 'the conflicts between the deposition and affidavit raise only sham issues.'" *Id.* (quoting *Camfield*, 719 F.2d at 1366). For example, "when the affiant states in his affidavit that he was confused in his deposition or where the affiant needs to explain portions of his deposition testimony that were unclear, the district court should not strike the affidavit from the record." *Id.*; *see also McDonough*, 608 F.3d at 391 ("Contradictory testimony in these instances is typically only allowed when the party was confused and needs to clarify an earlier statement."). "In addition, when the affiant's affidavit does not actually contradict his earlier testimony, the district court should not strike the affidavit from the record." *City of St. Joseph*, 439 F.3d at 476. The Eighth Circuit has indicated that the timing of an affidavit's filing is probative of whether the affidavit was filed in an attempt to generate issues of material fact. *See id.* Where the affidavit is filed on the same date that a response to a motion for summary judgment is due, the affidavit is "highly suspicious" and, coupled with other indicia that it is a sham, the court operates within its power to strike it. *Id.*

Here, Andreassen and his wife both executed their affidavits on February 25, 2015, the same date Andreassen filed the Resistance. *See* Plaintiff Appendix at 12, 14. The timing of the affidavits is suspicious and militates in favor of striking them. However, although a close call, the court shall not strike the affidavits on this issue. Hy-Vee argues that Andreassen does not state that he was confused during his deposition or that he needs to explain or clarify portions of his deposition testimony that are unclear. Reply at 4.

However, the court does not read the case law to require such phrases be used to save an affidavit. Here, the statements made in Andreassen's deposition do not necessarily conflict with the statements made in his affidavit. All he states in his deposition is that, at some point following his termination, he became too ill to work. He does not specify a time period during which this occurred, nor was he prompted to do so during his deposition. Andreassen's affidavit could be interpreted as conflicting with the answers given in his deposition, but it could also serve as mere clarification.

Additionally, Andreassen testified that he was busy taking care of his parents during the period following his termination from Hy-Vee. *See* Defendant Appendix at 9. This alone raises a genuine issue of fact regarding whether Andreassen could perform the essential functions of his job during that time period. If, after his termination, Andreassen was not working so that he could care for his parents, and not because he was unable to work due to his diabetes, then he may have been a qualified individual. Accordingly, the court shall deny the Motion with regard to the argument that Andreassen was not a qualified individual.

### B.  *Failure to Accommodate*

Hy-Vee argues that summary judgment is appropriate on Andreassen's failure to accommodate claim because "there is no evidence that Hy-Vee ever denied [Andreassen] a requested accommodation to manage his diabetes." Brief in Support of the Motion at 11. Hy-Vee points out that Andreassen was never denied a request to take a break to monitor his blood sugar or eat a small meal. *Id.*  Hy-Vee also argues that Andreassen's move to the bakery was a reasonable accommodation because his pay and benefits remained the same in both positions. *Id.* at 11-12. Hy-Vee maintains that it moved Andreassen following his request for a more regular schedule. *Id.* at 12. Andreassen argues that he requested a modified gas station schedule following his diagnosis with diabetes. Brief in Support of the Resistance at 6. He argues that Hy-Vee's refusal to modify his schedule, without demonstrating that it would cause an undue hardship, constitutes a failure to

accommodate. *Id.* at 7. Andreassen argues that he raised the issues of breaks and schedule modification at both his position in the gas station and in the bakery. *Id.* at 6-7. He states that he took only approximately five breaks over approximately thirty-five shifts at the bakery. *Id.* at 7. He argues that various statements made by Hy-Vee management demonstrate Hy-Vee's unwillingness to provide him with an accommodation. *Id.* at 7-8.

Under the ADA, the term "reasonable accommodation" may include: "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). "There is no precise test for what constitutes a reasonable accommodation . . . ." *E.E.O.C. v. Convergys Customer Mgmt. Grp., Inc.*, 491 F.3d 790, 796 (8th Cir. 2007). However, the employer is not required to provide the employee with the accommodation of the employee's choice. *Minnihan*, 779 F.3d at 813 (quoting *Rehrs v. Iams Co.*, 486 F.3d 353, 359 (8th Cir. 2007)). Generally, whether an accommodation is reasonable is a question of fact for the jury. *Convergys*, 491 F.3d at 796.

The determination of whether a reasonable accommodation is available is generally made through an informal, flexible interactive process. The court will not require the employer to engage in the interactive process unless the disabled employee initiates it and provides the "relevant details of his disability" to his employer. *Schaffhauser*, 794 F.3d at 906; *see also E.E.O.C. v. Prod. Fabricators, Inc.*, 763 F.3d 963, 971 (8th Cir. 2014) ("While the interactive process is 'informal and flexible,' the 'predicate requirement triggering the interactive process is the employee's request for the accommodation . . . .'" (quoting *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1045 (8th Cir. 2005))). As the court noted above, at that time, assuming the plaintiff can demonstrate that a reasonable

accommodation is possible, the burden then shifts to the employer to demonstrate that it is unable to accommodate the employee. *Fenney*, 327 F.3d at 712.

In order to show a failure to engage in the interactive process, the disabled employee bears the burden of demonstrating that:

> (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*Schaffhauser*, 794 F.3d at 906 (formatting omitted). While "[t]here is no per se liability under the ADA if an employer fails to engage in the interactive process," at the summary judgment stage, the failure to do so "is prima facie evidence that the employer may be acting in bad faith." *Minnihan*, 779 F.3d at 813 (quoting *Cravens v. Blue Cross & Blue Shield of Kan. City*, 214 F.3d 1011, 1021 (8th Cir. 2000)).

### 1. Shift rotation as an essential function

Hy-Vee argues that Webber was not required to modify Andreassen's schedule at the gas station because the rotating shift schedule employed there is an essential function of the job. *See* Reply at 1 ("While job restructuring is a possible accommodation under the ADA, an employer need not reallocate or eliminate the essential functions of a job to accommodate a disabled employee."). In *Rehrs v. Iams Co.*, the Eighth Circuit stated that "[i]t is not the province of the court to question the legitimate operation of a . . . facility or determine what is the most productive or efficient shift schedule for a facility." *Rehrs*, 486 F.3d at 358. The Eighth Circuit also recognized that the essential functions of a job can encompass more than simply the core job requirements; "indeed, it also may include scheduling flexibility." *Id.* This is because, "[u]nder the ADA, an accommodation that would cause other employees to work harder, longer, or be deprived of opportunities is not mandated." *Id.* at 357.

"Although an employee retains the ultimate burden of persuading the trier of fact that he or she can perform the essential functions of a position, 'much of the information which determines those essential functions lies uniquely with the employer.'" *Kallail*, 691 F.3d at 930 (quoting *Benson*, 62 F.3d at 1113)).  Courts consider a variety of factors in determining whether a job function is essential, including, among others:

> (i) [t]he employer's judgment as to which functions are essential; (ii) [w]ritten job descriptions prepared before advertising or interviewing applicants for the job; (iii) [t]he amount of time spent on the job performing the function; (iv) [t]he consequences of not requiring the incumbent to perform the function . . . .

*Id.* (alterations in original) (quoting 29 C.F.R. § 1630.2(n)(3)).  In *Rehrs*, the employer advanced specific evidence that shift rotation was an essential function of the job in question because all of the relevant positions "operated under a High Performance Work System (HPWS), and shift rotation was a component of this system."  486 F.3d at 357.  The employer also stated that "shift rotation exposes employees to management, and to more resources, suppliers, and outside customers with whom the company only interfaces during the day shift."  *Id.*  Therefore, "not enforcing shift rotation would adversely affect other [employees], creating inequalities, because these other [employees] would be forced to work the night shift exclusively or for longer periods and lose the benefits of shift rotation" and not enforcing shift rotation would "undermine the team concept."  *Id.*  Similarly, in *Kallail*, the employer listed shift rotation in its written job description of the position in question and stated that "the rotating shift provides enhanced experience and training for [employees]" and provided specific examples of the ways in which it did so.  691 F.3d at 931.  The employer also focused on the "non-work life" enhancement of rotating shifts, "by spreading the less desirable shifts—nights and weekends—among all [employees]."  *Id.*

Here, Hy-Vee has failed to establish, as a matter of law, that shift rotation is an essential function of Andreassen's position at the gas station for purposes of summary judgment. In both *Rehrs* and *Kallail*, the employers provided specific reasons why they believed that shift rotation was an essential function of the job in question—they also generally stated that not providing for shift rotation would be inequitable to other employees. Here, Hy-Vee has not provided any specific reasons as to why shift rotation is an essential function of the gas station position—for example, it has not stated the benefits of shift rotation to employees or demonstrated that shift rotation is part of the gas station position's job description or that it was advertised as such. Rather, Hy-Vee relies on general propositions that courts are not in the business of deciding which shift schedules are the most productive and states that other employees would have to work less desirable hours if Andreassen was allowed to work straight day shifts.[2] *See* Reply at 2. The court does not sit "as a super-personnel department that reexamines an entity's business decisions." *Keefe v. City of Minneapolis*, 785 F.3d 1216, 1227 (8th Cir. 2015) (quoting *Ebersole v. Novo Nordisk Inc.*, 758 F.3d 917, 927 (8th Cir. 2014)). However when, as here, the employer has provided no evidence other than general statements regarding productivity and efficiency, the court cannot say that the employer has demonstrated that summary disposition is appropriate regarding the essential functions of a job. Accordingly, the court shall deny the Motion with regard to the argument that the essential functions of the gas station position categorically excused Hy-Vee from changing Andreassen's shift schedule as a reasonable accommodation.

---

[2] The court also notes that Hy-Vee did not argue that shift rotation is an essential function of the gas station position in the Motion or state as much at the time Webber refused to modify Andreassen's schedule, but rather asserted it for the first time in its Reply. Therefore, even though the court considers the employer's judgment as to which functions of a job are essential, this consideration is weakened by Hy-Vee's late assertion of this fact.

### 2. *Good faith and reasonable accommodation*

Andreassen argues that Hy-Vee's failure to provide him with a modified work schedule without demonstrating undue hardship is evidence that Hy-Vee did not engage in the interactive process and that it failed to reasonably accommodate him. *See* Brief in Support of the Resistance at 7. Hy-Vee argues that, when it offered Andreassen the option of transferring to the bakery, it provided a reasonable accommodation. Brief in Support of the Motion at 11-12. It argues that, even if shift rotations are not an essential function of the gas station position, the transfer to the bakery does not violate the ADA because employees are entitled only to a reasonable accommodation, not their preferred accommodation. Reply at 2.

The Eighth Circuit recognizes reassignment as a reasonable accommodation. *See Cravens*, 214 F.3d at 1018. Courts will not require the employer to craft new positions to place the disabled employee into such positions, nor is an employer required to "bump" other employees out of existing positions in order to reassign a disabled person to that position. *Id.* at 1019. The employer is only bound to consider reassignment if accommodations within the employee's current position would pose an undue hardship and there is an existing and vacant position available. *Id.* Promotion is not required during a reassignment, and, in fact, "[a]n employer may reassign an employee to a lower grade and paid position if the employee cannot be accommodated in the current position and a comparable position is not available." *Id.* (alteration in original) (quoting *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998)).

In *Rehrs*, the employer encouraged the plaintiff to apply for other vacant positions in the company that did not require a shift rotation, but the plaintiff declined to do so, citing disinterest in the work, and was denied one position for lack of experience. 486 F.3d at 355. The Eighth Circuit noted that, where an employer offers reassignment as a reasonable accommodation, to prevail on a failure to accommodate claim, "the employee must offer evidence showing both [(1)] that the position offered was inferior to [his] former

job and [(2)] that a comparable position for which the employee was qualified, was open." *Id.* at 359 (quoting *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 99 (2d Cir. 1999)). The Eighth Circuit noted that the plaintiff had failed to provide any evidence of a comparable position for which he was qualified. *Id.* Rather, he sought to have his employer craft a position that allowed him to work straight-shifts in his old position, or reassign the essential functions of his old position as an accommodation, neither of which the employer was required to do. *Id.*

Here, Andreassen's contention that he should have been able to modify his schedule to work straight shifts in the gas station essentially amounts to a request to craft a new position in the gas station or to mere displeasure that he was not given the accommodation of his choice. The evidence of record demonstrates that, following Andreassen's request for an accommodation, Hy-Vee identified two full-time positions offering the same salary and benefits as the gas station position—a night stocker position and the bakery position. *See* Defendant Appendix at 21-22. Though Andreassen argues that he was "forced" to take the bakery position, the record demonstrates that he was also offered the night stocker position and declined it.[3] *See id.* at 26; *see also* Plaintiff Statement of Additional Facts ¶ 20. Andreassen has identified no evidence in the record suggesting that Hy-Vee failed to act in good faith in attempting to identify a reasonable accommodation for his diabetes.

---

[3] Of course, Andreassen was free to reject the transfer. Lewis's statement that the bakery position was Andreassen's "last chance" at Hy-Vee fails to create a genuine issue of fact regarding failure to accommodate. At the time Lewis made that statement, Andreassen had already been offered an accommodation in the form of a transfer to either the night stocker or bakery position and so the comment does not provide evidence of bad faith or unwillingness to accommodate. Furthermore, if an employee refuses a reasonable accommodation proffered by an employer, the employer is within their right to terminate the employee and does not thereby violate the ADA. *See* 29 C.F.R. § 1630.9(d) (providing that, if an employee rejects a reasonable accommodation that allows them to perform the essential functions of the job, the employee is not a "qualified individual" under the statute).

The documentary evidence only shows that Hy-Vee attempted to find an accommodation and in fact offered two to Andreassen. Hy-Vee was not required to modify Andreassen's gas station shift schedule so long as it provided him an alterative accommodation that was reasonable.[4] *See Minnihan*, 779 F.3d at 813.

Andreassen has failed to demonstrate that a genuine issue of fact exists as to whether the transfer to the bakery itself was a reasonable accommodation. He admits that he is unaware of any alternative positions for which he was qualified at the time he was moved from the gas station to the bakery. *See* Defendant Appendix at 22. This alone would be sufficient to preclude any argument that his transfer amounted to a failure to accommodate under the two-part test in *Rehrs*. However, he also has not produced evidence demonstrating that the bakery position was inferior to his position in the gas station. Instead, he readily admits that his benefits and pay remained the same following his transfer. *See id.* at 21; *see also* Defendant Statement of Facts ¶ 16. If anything, the position in the bakery fulfilled an explicit accommodation that Andreassen had requested: a more consistent, straight-shift schedule. *See* Defendant Appendix at 25-26 (Andreassen deposition testimony stating that he "just was asking for a more consistent schedule" and that "[i]t was the fluctuation in the schedule, where one week [Andreassen] was on the closing schedule, the night schedule, and then fluctuating back to a day schedule," that was the issue).

Andreassen argues that the crux of his request for accommodation was to work with more people so that he could take more consistent breaks and that, therefore, his transfer

---

[4] The court also notes that modification of the gas station position may have been undesirable for both Hy-Vee and Andreassen, as tensions had mounted between Webber and Andreassen following her attempt to suspend him for miscounting the cash registers. *See* Reply at 5; Brief in Support of the Resistance at 2-3. The fact that Andreassen identified other employees who could have worked the night shift does not change the court's analysis, especially considering the fact that asking other employees to work more night shifts may create inequalities.

to the bakery—wherein he would spend half of his shift alone—constitutes a failure to accommodate. *See* Brief in Support of the Resistance at 3, 10. However, Andreassen has not pointed to any evidence in the record suggesting that the accommodation provided did not allow him to perform the essential functions of his job. He generally argues that "[w]ith no one else in the department for half of his shift, [Andreassen] had no one to ask whether he could take a break, and no one to cover for him if he did take a break." *Id.* at 10. He also points out that he only took approximately five breaks during his time in the bakery as evidence that the transfer failed to accommodate him. *Id.* at 7. However, Andreassen acknowledges that no one at Hy-Vee ever denied any of his requests to take a break to monitor his diabetes. Defendant Statement of Facts ¶ 23. Andreassen testified in his deposition as follows:

> Q.   . . . [Y]ou told me earlier that you would contact the night shift manager, tell him you needed to go to the restroom to check your blood sugar, tell him you needed to eat something, would go to the front of the store, buy a granola bar, and you managed [your diabetes] that way. Is that correct?
>
> A.   On a couple occasions I asked that, but I did not ask that on a consistent basis, no.
>
> Q.   And what prevented you from doing that?
>
> A.   I just didn't feel — I didn't — I just feel — most of the time I'm just like, well, I'm just going to have to get through it the best I can. But there were some days I was like, man I need to — I need help today.
>
> Q.   And when you asked for that help, they allowed you to take the break and check your . . . blood sugar; correct?
>
> A.   Well, I wouldn't consider it a break. I was allowed to go to the bathroom.

Defendant Appendix at 26. He also acknowledges that Hy-Vee has a policy allowing for regular breaks for its employees. *See* Brief in Support of the Resistance at 10-11.

The evidence in the record would not permit a reasonable jury to find that the transfer to the bakery constituted a failure to accommodate. Accordingly, the court finds that summary judgment is appropriate on the record before it. Andreassen does not state that Hy-Vee took steps to prevent him from managing his diabetes or even took steps to discourage him from taking breaks. Andreassen's unsupported belief that he could not take a break, when he chose not to request one, cannot defeat summary judgment. Therefore, the court finds that Andreassen has not demonstrated that a genuine dispute exists as to whether Hy-Vee failed to accommodate his Type II diabetes. Accordingly, the court shall grant the Motion with regard to Andreassen's failure to accommodate claim.

## C. Discrimination

Hy-Vee argues that summary judgment is appropriate on Andreassen's discrimination claims because "there is no evidence that [Andreassen's] reassignment from the gas station to the bakery could constitute an adverse employment action." Brief in Support of the Motion at 13. Hy-Vee also argues that, even though Andreassen's termination constituted an adverse employment action, Andreassen has not produced evidence sufficient to generate a genuine issue of fact regarding Hy-Vee's motivation in terminating Andreassen. *Id.* at 13-14. The court shall first consider whether Andreassen's reassignment constitutes an adverse employment action and will then consider the issue of motivation and pretext.

### 1. Adverse employment action

Hy-Vee argues that Andreassen cannot establish that he suffered an adverse employment action when he was transferred from the gas station to the bakery. Hy-Vee relies on the fact that the bakery position "provided the regular hours that [Andreassen] sought with no loss of pay or benefits." *Id.* at 13. Andreassen argues that the transfer to the bakery constituted an adverse employment action because it forced him to work alone for large portions of his shift, despite the fact Andreassen requested a position that could accommodate his need to take regular breaks to manage his diabetes. Brief in Support of

the Resistance at 10. He argues that any policy Hy-Vee has in place to provide breaks is meaningless when Hy-Vee "do[es] not have other employees present to fill in and cover a department." *Id.* at 10-11. He also argues that the transfer constituted an adverse employment action because he was forced to learn new skills such as labeling products and was later fired for, among other things, mislabeling products. *Id.* at 11.

An "adverse employment action" under the ADA is "one that causes a material change in the terms or conditions of employment." *Brown v. Cox*, 286 F.3d 1040, 1045 (8th Cir. 2002). "To be 'adverse,' an employment action must do more than merely make an employee unhappy, but it need not always involve termination or even a decrease in benefits or pay." *Id.*; *see Zhuang v. Datacard Corp.*, 414 F.3d 849, 854 (8th Cir. 2005) (noting that a complaint that "amount[s] to a personal preference for one position over the other" does not allege an adverse employment action). Job transfers can constitute an adverse employment action under certain circumstances. "A transfer constitutes an adverse employment action when the transfer results in a significant change in working conditions or a diminution in the transferred employee's title, salary, or benefits." *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 919 (8th Cir. 2000). "Nevertheless, a transfer from one job to another is not an adverse employment action if it involves only minor changes in the employee's working conditions with no reduction in pay or benefits." *Brown*, 286 F.3d at 1045. "Changes in duties or working conditions that cause no materially significant disadvantage . . . are insufficient to establish the adverse conduct required to make a prima facie case." *Zhuang*, 414 F.3d at 854 (quoting *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994)). However, "an employer cannot insulate itself from liability for discrimination merely by offering a transfer at the same salary and benefits." *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 n.2 (8th Cir. 1997).

Among other things, a transfer that includes the "employer's moving an employee's office to an undesirable location, transferring an employee to an isolated corner of the

workplace, and requiring an employee to relocate her personal files while forbidding her to use the firm's stationary and support services" may constitute an adverse employment action. *Id.* (quoting *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 456-57 (7th Cir. 1994)). Additionally, a transfer amounting to an adverse employment action may involve "a considerable downward shift in skill level required to perform [the employee's] new job responsibilities." *Meyers v. Neb. Health & Human Servs.*, 324 F.3d 655, 660 (8th Cir. 2003); *see also Brown*, 286 F.3d at 1045-46 (finding an adverse employment action when a nurse was transferred from the surgical unit to the sterile supply room where the transfer may have damaged her future career prospects, the position in the supply room did not utilize her nursing skills and she and others viewed it as a demotion). But, for example, "a transfer that required the plaintiff to move from one city to another was not actionable because the transfer did not entail a change in his salary, benefits, or any other aspect of his employment." *Spears v. Mo. Dep't of Corrections & Human Res.*, 210 F.3d 850, 854 (8th Cir. 2000) (citing *Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 359 (8th Cir. 1997)); *see also Turner v. Gonzales*, 421 F.3d 688, 697 (8th Cir. 2005) ("We are not persuaded that the normal inconveniences associated with any transfer, such as establishing one's professional connections in a new community, are sufficient, without more, to demonstrate a significant change in working conditions.").

Although a close call, the court finds that Andreassen has demonstrated the existence of a genuine issue of material fact regarding whether the transfer was an adverse employment action. Initially, the court notes that the transfer to the bakery position did not precipitate a loss in pay or benefits for Andreassen. Additionally, no party has advanced evidence that the bakery position was considered a demotion from the gas station, that it required considerably less skilled work or damaged Andreassen's future career prospects. However, these facts alone are not dispositive. Andreassen has demonstrated that the bakery position differs from the gas station position in two ways. First, Andreassen states that, at the gas station "he had at least one co-employee to assist

him until the end of the night" and thus provide him time to take breaks and manage his diabetes. Brief in Support of the Resistance at 10; *see also* Defendant Appendix at 17-18 (indicating that there were "two closers" at the gas station on the night shifts). However, at the bakery, Andreassen was by himself in the department for approximately half of his shift. Brief in Support of the Resistance at 10; *see also* Defendant Appendix at 28 (indicating that Andreassen worked alone beginning at 3:00 p.m. or 4:00 p.m. every day in the bakery). The court finds that isolation alone, where Andreassen has expressed concerns about working by himself, is sufficiently adverse to avoid summary judgment.

Second, Andreassen was also required to learn an entirely new set of skills to work in the bakery, such as labeling and packaging. Brief in Support of the Resistance at 11. Although the requirement to learn new skills may be similar to the requirement of a transferee to create new professional connections in a new community, *see Turner*, 421 F.3d at 697, a reasonable jury could find that such a significant break from the duties and skills Andreassen used in the gas station constituted a "change in . . . any other aspect of his employment." *Spears*, 210 F.3d at 854. Therefore, the court finds that the evidence in the record is sufficient to generate a genuine dispute regarding whether the transfer was an adverse employment action because it represented a "significant change in working conditions." *Fisher*, 225 F.3d at 919. Accordingly, the court shall proceed to consider whether Andreassen has demonstrated the existence of a genuine issue of fact regarding motivation and pretext as to both his transfer and termination.

### 2. *Motivation and pretext*

Hy-Vee argues that it has advanced a legitimate, nondiscriminatory reason for transferring and subsequently terminating Andreassen. Hy-Vee states that it transferred Andreassen because he "did not wish to work at the gas station under . . . Web[b]er anymore and had requested to accommodate his diabetes by assigning him to a straight shift." Reply at 5. Hy-Vee asserts that it terminated Andreassen due to poor work performance in the form of "a general pattern of carelessness in repeatedly leaving the gas

station unlocked, miscounting money, and, ultimately, mislabeling bakery products." *Id.*; *see also* Brief in Support of the Motion at 14. Hy-Vee also points to the fact that it employs, and in fact hired after Andreassen's termination, several diabetics and that Weber, who initiated the process resulting in Andreassen's termination, is himself diabetic. Brief in Support of the Motion at 15. Andreassen does not specifically address motivation or pretext in the Resistance, but he does "dispute[] several of the mistakes that he allegedly made in June and July 2014, which precipitated his termination." Brief in Support of the Resistance at 11. He states that he had no opportunity to dispute the alleged mistakes, nor was he offered additional training. *Id.* He also argues that Green "scrutinized [Andreassen's] work until he could terminate [Andreassen]." *Id.*

Andreassen can demonstrate that Hy-Vee's explanations for his transfer and termination are pretext by: (1) showing that the explanation is without basis in fact or (2) persuading the court that discrimination is the more likely motivating factor behind the adverse employment action. *See Torgerson*, 643 F.3d at 1047. "Either route amounts to showing that a prohibited reason, rather than the employer's stated reason, actually motivated the employer's action." *Id.* "The critical inquiry in discrimination cases like this one is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge." *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 861-62 (8th Cir. 2009) (discussing a claim of sex discrimination under Title VII of the Civil Rights Act); *see also Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1004 (8th Cir. 2012) (analyzing an alleged violation of the ADA and stating that "[i]t is not [the court's] province to determine whether the employer's investigation of alleged employee misconduct reached the correct result, so long as it truly was the reason for the plaintiff's termination"). "A showing that the employer made a mistaken and unreasonable determination that an employee violated company rules does not prove that the employer was motivated by a known disability." *Pulczinski*, 691 F.3d at 1003. Rather, the

employee must demonstrate that the employer acted due to "intentional discrimination." *Id.* Courts will not second-guess ill-advised, unwise or even unfair employment decisions unless the employee can demonstrate that the employer has offered a "phony excuse." *Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1034 (8th Cir. 2005) (quoting *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004)).

### a. The transfer

The court finds that Andreassen has not demonstrated the existence of a genuine dispute of a material fact regarding pretext in relation to his transfer to the bakery. He merely relies on unsupported allegations in his affidavit that he was moved to the bakery because his supervisor at the gas station "did not want to accommodate [his] request for [a] change in [his] schedule." Plaintiff Appendix at 10. He also argues that the transfer "place[d] [him] in a new and unfamiliar position in the bakery, with inadequate training, ma[king] it easy for the managers to find reasons to terminate [him]." *Id.* However, Andreassen's speculations and self-serving statements are insufficient to defeat summary judgment. "[A] properly supported motion for summary judgment is not defeated by self-serving affidavits." *Frevert v. Ford Motor Co.*, 614 F.3d 466, 473 (8th Cir. 2010) (alteration in original) (quoting *Bacon v. Hennepin Cty. Med. Ctr.*, 550 F.3d 711, 716 (8th Cir. 2008)). "Rather, the plaintiff must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." *Id.* at 473-74 (quoting *Bacon*, 550 F.3d at 716).

Here, the evidence shows that Hy-Vee moved Andreassen to the bakery after he requested a scheduling accommodation at the gas station. *See* Defendant Appendix at 26 (deposition testimony from Andreassen stating that the shift rotation at the gas station "didn't work" for him and that he "did ask for help with the schedules from [Webber]"). Andreassen does not dispute that the bakery has a straight-shift schedule that does not vary from week to week. *Id.* Therefore, the bakery position does, at least in part, fit the specifications Andreassen requested in his accommodation. Based on Andreassen's own

testimony, the only reasons readily discernible for Andreassen's transfer were his desire for a more consistent schedule or his desire to discontinue working under Webber. *See* Reply at 5; Brief in Support of the Resistance at 3 (stating Andreassen had "expressed concern about continuing to work for [Webber]" to Green). As the court recognized above, the issue is not whether Hy-Vee's action was fair or reasonable, but whether it was motivated by an illegal discriminatory animus. Therefore, regardless of whether the crux of Andreassen's request for accommodation was to work around more people, the *motivation* for his transfer, as demonstrated by the record before the court, was merely an attempt by Hy-Vee to provide an accommodation for Andreassen based on the information he provided to it. Andreassen has pointed to no evidence in the record to suggest that the true motive behind his transfer was discriminatory animus and his unsupported, self-serving statements that he was transferred to the bakery with an eye toward termination are insufficient to generate an issue of material fact. In fact, the evidence in the record demonstrates that Andreassen was trained upon his transfer to the bakery, with instructions to not label certain products if he did not know how. *See* Plaintiff Appendix at 9-10. Therefore, the evidence in the record demonstrates that Hy-Vee gave Andreassen the training and tools he needed to avoid the mislabeling violations that ultimately precipitated his termination. Andreassen has not demonstrated the existence of a genuine issue of material fact regarding whether his transfer to the bakery was made for the purpose of generating a reason to terminate him. Accordingly, the court shall grant the Motion with regard to discrimination based on Andreassen's transfer.

### b.    The termination

The court further finds that Andreassen has failed to demonstrate the existence of a genuine dispute of material fact regarding whether Hy-Vee discriminated against Andreassen when it terminated him. Hy-Vee has supported its justification for termination, that is, Andreassen's history of poor work performance, with documentary evidence of numerous instances of discipline. *See* Defendant Appendix at 68-83. In

particular, Hy-Vee provides "occurrence" forms stating that Andreassen had left the gas station doors unlocked overnight; miscounted registers and failed to complete tasks in the bakery, such as properly storing products overnight, taking out the garbage, cleaning the sinks and failing to properly label products. *See id.* Andreassen admits that many of the occurrences that he was given constitute serious violations. *See id.* at 16 (Andreassen deposition testimony stating that leaving the gas station unlocked is a "very serious" problem); *id.* at 29 (Andreassen deposition testimony stating that improperly labeling a product could be a "serious" problem for someone with allergies and that properly labeling a product is "very important" to the food industry).[5] Accordingly, the burden shifts back to Andreassen to demonstrate that Hy-Vee's proffered justification is pretext.

Andreassen suggests that Hy-Vee's failure to train him both before and after several of his occurrences in the bakery suggest that the proffered reason for his termination is pretextual. *See* Brief in Support of the Resistance at 11. However, the evidence in the record does not support this argument. To begin, Andreassen admits that "the initial training that [he] did receive was good." Plaintiff Appendix at 10. Hy-Vee also states that "bakery clerks are trained by shadowing an employee that currently performs those types of jobs." Defendant Appendix at 62. There is a dispute as to how many days Andreassen shadowed other employees, but Andreassen does admit that he trained with several other bakery workers. *Compare id.* (Hy-Vee stating that Andreassen trained for "six, eight-hour shifts") *with* Plaintiff Appendix at 8 (Andreassen stating that he trained for two full days and then was scheduled to close by himself on the third day). However, Andreassen has produced no evidence demonstrating that Hy-Vee trained him differently than any of its

---

[5] To the extent that Andreassen now attempts to recharacterize the labeling occurrences as "minor mistakes," the court rejects such an argument. *See* Plaintiff Appendix at 3. Such a characterization is directly contrary to Andreassen's earlier deposition testimony and appears in an affidavit signed on the date the Resistance was filed. This self-serving statement is insufficient to defeat summary judgment.

other bakery employees. While he may not have considered his training complete, he has not set forth any evidence that Hy-Vee purposefully provided him an incomplete training or that it trained him differently from its other employees to generate an excuse to fire him due to his disability.

Andreassen also argues that several comments made by Hy-Vee personnel demonstrate that the reason set forth for his termination was mere pretext. *See, e.g.*, Brief in Support of the Resistance at 7-8. However, the statements that Andreassen points to do not raise a genuine issue of material fact regarding his termination. Lewis apparently stated that her mother, who works with diabetics, said that all diabetics will die from the disease. Plaintiff Statement of Additional Facts ¶ 5. This statement, while perhaps insensitive, does not shed light on Hy-Vee's motivation for terminating Andreassen. Nor does Green's comment, "I hope you are not using your [d]iabetes as a crutch, because it will eventually come out from under you, and you are going to fall flat on your face." *Id.* ¶ 31. Again, while perhaps not a model of sensitivity, Green's comment does not directly bear on Hy-Vee's proffered justification for termination. Green's comment merely recognizes that Andreassen's work performance is separate and apart from his disability, and he expressed displeasure only with the former. The court also notes that Hy-Vee currently employs, and in fact hired after Andreassen's termination, other diabetic employees and many other employees with disabilities. *See* Defendant Appendix at 65-67. This practice lends credence to Hy-Vee's stance that it did not terminate Andreassen due to his diabetes. Andreassen generally asserts that "[s]ince [Hy-Vee] had other employees with [d]iabetes who did not request accommodations, [Hy-Vee] apparently concluded that no [d]iabetics should be provided with accommodations." Plaintiff Appendix at 11. This statement is without support in the record. Andreassen has provided no evidence of the identities of the other diabetics employed by Hy-Vee, nor has he provided any evidence that they chose not to request accommodations. Therefore, the court rejects Andreassen's argument that his mangers' comments raise a genuine issue of fact as to pretext.

Andreassen further disputes that he actually committed many of the violations that precipitated his termination. However, as the court stated above, it is not the province of the court to determine whether Andreassen did, in fact, commit the occurrences in question. Instead, where Hy-Vee has a good faith belief that he committed the conduct in question, it may terminate him without violating the ADA. *See McCullough*, 559 F.3d at 861-62. Andreassen's bare assertions that he did not commit the occurrences, without more, are insufficient to demonstrate the existence of a genuine issue of material fact. He states that he "do[es] not believe that [he] was the one who mislabeled" the product and that he "do[es] know [another product was labeled] by a co-worker named Dor, as she was working on them right beside [him] while [he] worked on another item the day before." Plaintiff Appendix at 9. However, Andreassen has produced no deposition testimony, no other affidavits and no other documentary evidence of any kind to support his assertion. This is insufficient to defeat summary judgment. *See Frevert*, 614 F.3d at 473-74. Rather, Hy-Vee has supported its decision with documentary evidence that Andreassen has not adequately called into question. His mere speculation that Hy-Vee fabricated reasons to terminate him does not raise a genuine issue of fact regarding pretext.[6]

Andreassen also suggests that "mislabeling of items is a common occurrence" and that he is "aware of two occasions when mislabeling occurred." Plaintiff Appendix at 9. Andreassen places little emphasis on such statements, but out of an abundance of caution the court shall consider them. To the extent that these statements argue that mislabeling

---

[6] Andreassen also states that he "was never given the opportunity to defend [himself] regarding these allegations." Plaintiff Appendix at 9. Such an assertion, if true, might raise an issue of fact regarding pretext because it suggests that Hy-Vee was determined to terminate Andreassen regardless of whether he committed the occurrences or not. However, this assertion flatly contradicts his deposition testimony wherein he testified that he was "ask[ed] to explain or respond to the allegations" on June 26, 2014. Defendant Appendix at 30. He stated that he "denied most of them" and that he did not believe Hy-Vee conducted further investigations into them. *Id.* at 30-31. The court therefore rejects this argument and any inference of pretext it may raise.

is not a serious occurrence, this directly conflicts with his deposition testimony as the court found above. *See* Defendant Appendix at 29. The normalcy of mislabeling occurrences among Hy-Vee employees may suggest disparate treatment, which can support a claim of pretext under the ADA. *See McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 770 (8th Cir. 2008). To make such an argument, the plaintiff must prove "that he and the disparately treated [employees] were similarly situated in all relevant respects." *Id.* (alteration in original) (quoting *Sherman v. Runyon*, 235 F.3d 406, 409 (8th Cir. 2000)). Here, Andreassen has failed to do so. In fact, Andreassen has failed to provide any citations to the record demonstrating which other employees mislabeled products, which products they mislabeled, whether they were disciplined for doing so or whether they were similarly situated to him in any way.[7]

## VII. CONCLUSION

In light of the foregoing, the Motion (docket no. 9) is **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment in accordance with the above findings. The trial date is vacated.

**IT IS SO ORDERED.**

---

[7] The court does note that Andreassen provided a screenshot of a Facebook post in his materials to the Iowa Civil Rights Commission, allegedly depicting a mislabeled product. *See* Defendant Appendix at 54. However, this alone is insufficient to preclude summary judgment. First, Andreassen does not cite to this portion of the record to support his claim that he is "aware" that mislabeling occurred on other occasions. Second, this single screenshot, provided without context, sheds no light on the identity of the other employee who mislabeled this product or whether that employee was similarly situated to Andreassen.

**DATED** this 19th day of April, 2016.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA